### GREAT NORTHERN RY. CO. *v.* WALSH *et al.*

*(Circuit Court, D. North Dakota. September 14, 1891.)*

WHEAT INSPECTION—INTERSTATE COMMERCE.

Act N. Dak. 1890, c. 188, § 5, provides that it shall be the duty of every public warehouseman to receive for storage any grain, dry and in a suitable condition; that such grain in all cases be inspected and graded by duly-authorized inspectors, etc. Section 32 provides that "the charge for the inspection of grain shall be and constitute a lien on the grain so inspected, and when such grain is in transit the charges shall be treated as advance charges, to be paid by the common carrier in whose possession the same is at the time of inspection." *Held,* that the words "in transit," in section 32, did not apply to interstate shipments, and that inspectors could not require common carriers to open cars containing wheat consigned to other states for inspection at state lines.

In Equity. Bill by the Great Northern Railway Company against George H. Walsh and others, as commissioners of railroads of the state of North Dakota, John B. Wineman and others, as inspectors of grain for North Dakota.

*M. D. Grover* and *W. E. Dodge,* for plaintiff.

*C. A. M. Spencer,* Atty. Gen., and *Seth Newman,* for defendants.

Before CALDWELL and THOMAS, JJ.

CALDWELL, J. The plaintiff is a common carrier engaged in interstate commerce. As such common carrier it receives wheat in bulk into its cars in this state, for transportation into other states. The commissioners of railroads in this state, and the inspectors of grain, acting under the appointment and authority of such commissioners, claim the right to require the plaintiff to stop its trains at certain points on its road in this state, open its cars, and permit the grain inspectors of the state to inspect, in the cars, the wheat received in this state for transportation to other states, and actually in transit to its destination in other states, at the time. The commissioners claim that the right to do this is conferred on them by the act of the legislature of the state, entitled "An act to regulate warehouses, inspection, weighing, and handling of grain," (chapter 188, Laws 1890.) In answer to this claim the plaintiff says: *First,* that the act does not confer upon the commissioners any such powers; and, *secondly,* that if it does confer such powers, it is an unconstitutional interference with interstate commerce, and void. It is obvi-

ous, upon a careful reading of the act, that the purpose and intention of the legislature was to secure to the producers and holders of wheat in this state the right to have their wheat stored in public warehouses or elevators in the state, for a reasonable compensation, the act itself fixing the maximum rate for such storage, and to protect the owners of wheat so stored against fraudulent practices, by securing the return to them of the wheat they stored, or of other wheat of equal grade and value.    All the provisions of the act are directed to the accomplishment of these objects.    Its first section defines public warehouses, and by chapter 126, § 4, Acts 1891, the definition is greatly enlarged, and it is declared that—

"All buildings, elevators, or warehouses in this state, erected and operated, or which hereafter may be erected and operated, by any person or persons, association, copartnership, corporation, or trust, for the purpose of buying, selling, storing, shipping, or handling grain for profit, are hereby declared public warehouses, and the person or persons, association, copartnership, or trust owning or operating said building or buildings, elevator or elevators, warehouse or warehouses, which are now or hereafter may be located or doing business within this state, as above described, whether said owners or operators reside within this state or not, are public warehousemen within the meaning of this act, and none of the provisions of this act shall be construed so as to permit discrimination with reference to the buying, receiving, and handling of grain of standard grades, or in regard to parties offering such grain for sale, storage, or handling at such public warehouses, while the same are in operation."

Sections 2 to 4, inclusive, relate to licenses and bonds of public warehousemen.    Section 5 provides that—

"It shall be the duty of every public warehouseman to receive for storage any grain, dry and in a suitable condition for warehousing, that may be tendered to him in the usual manner in which such warehouses are accustomed to receive the same in the ordinary and usual course of business, not making any discrimination between persons desiring to avail themselves of warehouse facilities; such grain in all cases to be inspected and graded by a duly-authorized inspector, and to be stored with grain of a similar grade.   And in no case shall grain of a different grade be mixed together while in store, but, if the owner or consignee so requests, and the warehouseman consents thereto, his grain of the same grade may be kept in a bin by itself, apart from that of the owners, which bin shall thereupon be marked and known as a special bin.   If a warehouse receipt be issued for grain so kept separate, it shall state on its face that it is in a special bin, and shall state the number of such bin, and all grain delivered by a duly-authorized inspector of grain. Nothing in this section shall be construed so as to require the receipt of any kind of grain into any warehouse in which there is not sufficient room to accommodate or store it properly, or in cases where such warehouse is necessarily closed.   The charges for inspection, upon receipt and delivery, shall be paid by the warehouseman, and may be added to the charge of the storage. The chief inspector may recover such charges of the warehouseman by an appropriate action in his name."

This section is the marrow of the act.    All subsequent provisions are designed to render it operative and effective.    Section 6 requires the warehouseman to give a receipt for the grain stored, which "shall state

upon its face the kind and inspected grade of the grain, and that the grain mentioned on it has been received into store, to be stored with grain of the same grade by inspection," and, "if the grain was received from railroad cars, the number of each car shall be stated upon the receipt." Section 11 requires the warehouseman to post up weekly a statement of his business, and to render a similar statement, under oath, to the "register." Section 13 requires every warehouseman to publish his rates for storing wheat, and fixes the maximum charges which warehousemen are allowed to charge. Section 14 prohibits warehousemen from mixing grain of different grades. Sections 15 to 21 relate to weighing grain. Sections 22 to 31 relate to the appointment and qualifications of inspectors. Section 32 relates to securing the payment of charges for inspecting, and is as follows:

"The charge for the inspection and weighing of grain shall be and constitute a lien on the grain so inspected, and whenever such grain is in transit the said charges shall be treated as advance charges, to be paid by the common carrier in whose possession the same is at the time of the inspection."

In argument the learned attorney general was compelled to rest the authority for the commissioners' action in requiring the inspection of wheat in cars in transit to other states on this brief section, the sole object of which is to give a lien on the grain for the inspection fees. It is competent for the board to provide that wheat shipped for storage in the public elevators of the state may be inspected in cars at the place of shipment, or at the place of consignment, or between those places, and in either case it is an inspection of grain "in transit;" for the transit does not end until the wheat is delivered to the elevator. Contemplating, as the act does, an inspection in the cars of wheat in transit to the public elevators in the state, section 32 was intended to secure the payment of the inspection fees in such cases, and cannot be made to perform any other office. What "transit," then, is referred to in section 32? "In transit" where? To another state, where no regard would be paid to the inspection; or to some one of the public warehouses in this state, where the inspection would be effectual, and perform a useful and valuable office? "The transit" referred to in section 32, is the transit which must occur in getting the wheat into the public warehouses of this state. It has reference to an intra-state, and not an inter-state transit. If the legislature had designed to subject to inspection all the wheat exported from the state while it was in transit out of the state, that intention would have found expression in appropriate words. According to the soundest canons of construction, such an intention cannot be deduced or implied from the simple declaration that the charges for inspecting wheat in transit shall be a lien on the grain. Every word and line of the act having any reference to the inspection of grain, and giving authority to inspect it, relates to grain stored, or intended to be stored, in the public warehouses of the state, and it is to the transit of such grain that section 32 relates. The suggestion is made that when grain is put on railroad cars in this state it is usually put there for exportation, and not for transportation to another point in the state, and that, therefore, the

words "in transit" should be construed to mean interstate transit. But the act contemplates that grain will be shipped to the public warehouses of the state by rail. Section 6, as we have seen, provides that, "if the grain was received in railroad cars, the number of each car shall be stated upon the receipt;" and section 35 provides that, if the owner of the grain is dissatisfied with the inspection, he may stop its delivery to the public warehouses, but he must in such cases remove "the grain in railroad cars" within 24 hours, upon "such railroad company placing the same in a proper and convenient place for unloading." The authority of the commissioners to make rules relative to the inspection of grain is restricted to "such rules and regulations as may be necessary to enforce the provisions of this act, or any law of this state in regard to the same." They are invested with no discretion. They can only make such rules and regulations as are necessary to enforce the provisions of the act of the legislature. They can make no rules with regard to an inspection, which the act itself does not require to be made.

Rules 36 and 37 of the commissioners, under which the inspectors claim the right to require the plaintiff to stop its trains and open the cars containing wheat consigned to other states, for inspection, require this to be done "at terminal points." The words "terminal points" are not found in the act of the legislature, nor has our attention been called to any definition of them by the commissioners. There are no terminal points for interstate shipments of wheat in this state. This state exports, but does not import, wheat. The state line does not constitute a terminal point in such shipments. The terminal point of an interstate shipment is the place of consignment, or the point at which the carriage of one common carrier ends, and that of another begins. In the case of interstate shipments, the terminal points are usually points where the great lines of transportation center, and where wheat is dealt in extensively, and the convenience and necessities of commerce require either its storage or transshipment. There being no terminal points in this state for grain shipped in this state consigned to points in other states, the authority of the inspectors under the rules does not extend to such shipments. Nor do the rules impose on the plaintiff the duty to stop its train and submit to an inspection of the wheat in its cars, which is consigned to another state, and as to which there is no terminal point of shipment in this state. The only shipments of wheat which have "terminal points" in this state are shipments consigned to some points in this state. Thus construed, the rules are in harmony with the act of the legislature. The demand of the inspectors upon the plaintiff to open its cars for the purpose of having the wheat therein inspected, which was in transit to other states, finds no sanction in the rules or in the act of the legislature. It is undoubtedly competent for the state, by appropriate legislation, to require all wheat grown in the state to be inspected before it is exported. But the act under consideration deals only with the inspection of wheat stored or intended to be stored in the public warehouses or elevators in the state, and not with the inspection of exports. There is nothing in the act making it the duty of one who ships wheat out of the state, or of the

railroad company carrying such wheat, to have it inspected, either before or after it is put on the cars; nor does the act confer authority on the defendants to order or make such an inspection.